IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PHYLLIS HAHN, | ) | CASE NO. 4:16CV3062 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Phyllis Hahn ("Hahn") seeks judicial review of the final decision of Defendant
Commissioner of Social Security ("Commissioner") denying her applications for Disability
Insurance Benefits ("DIB") and Social Security Income ("SSI"). Doc. 1. This Court has
jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate
Judge pursuant to the consent of the parties. Doc. 4.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

In May 2012, Hahn filed applications for DIB and SSI alleging a disability onset date of
November 30, 2005. Tr. 531, 112, 117. She alleged disability based on the following: herniated
disc, hearing loss, hypertension, restless leg syndrome and ankles. Tr. 158. After denials by the
state agency initially (Tr. 68, 69) and on reconsideration (Tr. 70, 71), Hahn requested an
administrative hearing. Tr. 90. A hearing was held before Administrative Law Judge ("ALJ")
Paula Goodrich on April 23, 2012. Tr. 35-67. In her May 11, 2012, decision (Tr. 14-28), the
ALJ determined that there were jobs that existed in the national economy that Hahn could have
performed, i.e., she was not disabled. Tr. 26-27. The Appeals Council denied Hahn's request

for review.  Tr. 1-4.  Hahn appealed to the federal district court and the court reversed and remanded, in part, the ALJ's May 2014 decision.  Tr. 646-664.  The district court instructed the ALJ, on remand, to reconsider the opinion of treating source physician Mark Lewis, D.O., with respect to Hahn's ability to perform frequent gross and fine manipulation.  Tr. 664.

Meanwhile, Hahn had filed new applications for DIB and SSI on April 29, 2014, alleging a disability onset date of May 12, 2012.  Tr. 917, 917.  The state agency denied her claims initially (Tr. 695, 696) and on reconsideration (Tr. 731, 732).  The agency then consolidated these claims with Hahn's remanded claim.  Tr. 777.  A hearing was held before the same ALJ on all Hahn's claims on March 8, 2016.  Tr. 562-611.  In her June 20, 2016, decision (Tr. 531-549), the ALJ determined that, prior to August 4, 2014, there were jobs that existed in the national economy that Hahn could have performed, but that there were no jobs after August 4, 2014, that Hahn could have performed, i.e., she was not disabled prior to August 4, 2014, but became disabled after that date.  Tr. 546, 548.  Hahn requested review of the ALJ's decision by the Appeals Council (Tr. 874) and, on October 28, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 519-521.

## II. Evidence

### A.  Personal and Vocational Evidence

Hahn was born in 1961 and was 44 years old on her alleged onset date and 52 years old as of the date the ALJ found her to be disabled, August 4, 2014.  Tr. 112, 545.  She has a high school education and completed two years of college studying to be a licensed practical nurse (LPN).  Tr. 42, 159, 596.  She previously worked as an LPN and at a Dollar Tree store.  Tr. 45, 579.  She last worked in 2012 at Dollar Tree.  Tr. 579.

### B.  Relevant Medical Evidence

On March 2, 2009, Hahn had an MRI of her lumbar spine which showed a small disc herniation at the L5-S1 level that extended into the right neuroforamen, causing mild narrowing of her right neuroforamen.  Tr. 279.

On April 7, 2009, Hahn saw Brian Brocker, M.D., for her lumbar herniated disc upon referral of her primary care physician, Dr. Lewis.  Tr. 274-276.  Hahn complained of back and leg pain, 8/10, which was sharp, bilateral, burning, throbbing, constant, and disruptive to her sleep.  Tr. 274.  She also reported numbness, weakness, and burning sensations in her left leg.  Tr. 274.  Standing and walking made her pain worse and sitting relieved it.  Tr. 274.  She reported having experienced this condition for ten years and had no known injury.  Tr. 274.  She was currently working part-time.  Tr. 274.  Upon exam, she had a limited range of motion and tenderness in her back and she walked with an antalgic gait.  Tr. 275.  She had good pulses in all four extremities, normal reflexes, full muscle strength and intact sensation.  Tr. 275.  Dr. Brocker diagnosed her with disc herniation L5-S1 with back and leg pain.   Tr. 275.  He extensively discussed conservative treatment options with her and stated that she did not need surgery at that point.  Tr. 275.  He prescribed Ultram and Neurontin and recommended a follow-up in three months.  Tr. 276.

At her follow-up appointment on July 7, 2009, Hahn continued to have daily back pain, rated 5-6/10, that radiated into her left leg that was occasionally stabbing, aching, burning and occasionally disruptive to her sleep.  Tr. 277.  Medications helped her pain a little and lifting, bending, pushing and pulling made it worse.  Tr. 277.  She was still working.  Tr. 277.  She had not had physical therapy nor used a TENS machine.  Tr. 277.  Dr. Brocker diagnosed her with chronic low back pain, again discussed conservative treatment, and continued her medications.  Tr. 277.  She was to follow up in six months.  Tr. 277.

On January 26, 2010, Hahn returned and reported constant back pain that radiated into her left lower extremity daily and had gotten worse over the last two months. Tr. 278. She rated the pain in her back as 4/10 and the pain in her leg as 5/10. Tr. 278. Medication helped and doing dishes, standing too long, bending, walking and lifting made it worse. Tr. 278. Dr. Brocker again noted that she was working, that she had not had physical therapy nor used a TENS machine, and remarked that she did not do home exercises. Tr. 278. He diagnosed her again with chronic low back pain and increased her Neurontin. Tr. 278.

Dr. Lewis referred Hahn to pain management specialist Jose Torres, M.D., and she began seeing him on April 21, 2010. Tr. 364. She complained of low back pain for many years and having injured it at work as a nurse but stated she did not file a claim for her work injury. Tr. 364. She reported having back and leg pain, 7-8/10, and that standing made it worse. Tr. 364. Dr. Torres gave her a transforaminal steroid epidural at L5-S1. Tr. 365. On April 27, Dr. Torres wrote to Dr. Lewis that Hahn's treatment would consist of transforaminal epidural blocks and the prescribed medications Flexeril, Celebrex, Lidoderm patches, and Norco. Tr. 396. Dr. Torres also recommended a course of physical therapy for strengthening and flexibility. Tr. 396. Hahn was to follow up in 3-4 weeks. Tr. 396.

On July 20, 2010, Hahn saw Dr. Brocker and complained of daily back pain that disrupted her sleep, throbbing and burning in her left thigh, and occasional throbbing and burning in her left big toe and left foot. Tr. 352. Her back and leg pain was 6/10. Tr. 352. Her medication helped but did not last as long as it used to. Tr. 352. Standing, bending and lifting made it worse. Tr. 352. Dr. Brocker again remarked that Hahn had had no physical therapy, did not do home exercises and did not use a TENS unit. Tr. 352. She was still working. Tr. 352. Dr. Brocker continued her diagnosis of chronic low back pain, discussed conservative treatment,

remarked that she had obtained additional medication from Dr. Torres, and continued her Ultram and Neurontin.  Tr. 352.

Hahn saw Dr. Torres on July 27, 2010, reporting 60% relief after her last injection.  Tr. 362.  She reported pain as 7/10 and also pain going into her right lower extremity.  Tr. 362.  Dr. Torres gave her transforaminal steroid epidural blocks.  Tr. 363.  On August 24, Hahn told Dr. Torres that her last injection relieved her pain 70%.  Tr. 360.  Her low back pain was 3/10 and the pain in her left lower extremity was 1/10.  Tr. 360.  Dr. Torres gave her transforaminal steroid epidural blocks.  Tr. 361.

During the relevant period, Hahn saw a few providers at Greenville Community Health Center for a variety of unrelated complaints.   From August 29, 2010, through August 29, 2011, she saw Dr. Lewis six times.  Tr. 439-446, 514-517.  During these appointments, Hahn reported some musculoskeletal complaints but Dr. Lewis did not record any relevant examination findings.

On September 9, 2010, Hahn saw Michael Jones, D.O.  Tr. 337.  She had seen him two years prior and he had placed her in orthotics for posterior tibial tendon flatfoot dysfunction.  Tr. 337.  These had helped but Hahn reported that she recently had been having problems.  Tr. 337.  She reported a burning pain down her leg and pain in the lateral aspect of her ankle extending across her foot.  Tr. 337.  Dr. Jones wrote, "She has not been wearing the brace."  Tr. 337.  Upon exam, she had mild flatfoot deformity and tended to claw toes when standing, tenderness in the anterolateral ankle gutter across her midfoot, mild decreased sensation over the entire left lower extremity subjective to light touch and mild weakness to the dorsiflexion on the left compared to the right.  Tr. 337.  She had no significant weakness in her knee.  Tr. 337.  Dr. Jones assessed her with left ankle pain with a history of posterior tibial tendon dysfunction, degenerative joint

disease of the midfoot, and right lower extremity weakness and numbness.  Tr. 337.  He ordered an EMG and gave Hahn an injection in her left tibiotalar joint.  Tr. 337.

On September 21, 2010, Hahn saw Dr. Torres for a follow up visit and medication refill.  Tr. 385.  She complained of constant burning in her left leg and low back pain.  Tr. 358.  Dr. Torres gave her transforaminal steroid epidural blocks.  Tr. 359.

On September 30, 2010, Hahn had an EMG of her lower extremities that demonstrated bilateral femoral neuropathy and findings which suggested an L4 radiculopathy.  Tr. 216.

On October 7, 2010, Hahn saw Dr. Jones for a follow-up visit.  Tr. 336.  She reported that the injection he gave her "really helped" but that she still had numbness and tingling down her leg.  Tr. 336.  Upon exam, she had mild subjective numbness in the anterior aspect of both thighs, left worse than right; subjective numbness to light touch on her left leg, particularly laterally compared to her right; mild weakness of her left lower extremity to her ankle and resisted knee extension; normal reflexes; and continued but improved swelling of the posterior tibial tendon.  Tr. 336.  Dr. Jones reviewed her EMG results and assessed her with L4 radiculopathy on the left with bilateral femoral nerve neuropathy and left posterior tibialis tendon dysfunction.  Tr. 336.  He stated that because she was better after her ankle injection she should continue conservative treatment of her ankle and that he believed the other problems she experienced were related to her back.  Tr. 336.  He recommended another MRI and that Dr. Torres try a selective epidural steroid injection on the left at the L4 level to try and treat her radiculopathy.  Tr. 336.

On November 17, 2010, Hahn returned to Dr. Torres.  Tr. 355.  Her low back pain had decreased to 4/10 after her prior injections.  Tr. 355.  Dr. Torres gave her a lumbar epidural steroid injection.  Tr. 355.

On November 23, Hahn had another lumbar MRI that showed similar findings as her previous MRI.  Tr. 371.

On January 17, 2011, Hahn complained to Dr. Torres that her hands were going numb and her arms were going to sleep.  Tr. 435.

On January 18, 2011, Hahn returned to Dr. Brocker reporting constant back pain (8/10) radiating into both legs (9/10), left worse than right.  Tr. 470.  Heat and medication helped, although not for as long as before, and bending, walking, pushing the sweeper, and sitting in one position too long made it worse.  Tr. 470.  She also complained of numbness and tingling in her legs and hands if they were raised too long and weakness in her left leg.  Tr. 470.  Dr. Brocker commented that she had had physical therapy in the last year, did home exercises, and did not use a TENS machine.  Tr. 470.  She was still working.  Tr. 470.  Upon exam, she had numbness and tingling on the bilateral median nerve and a positive Phalen's test.  Tr. 470.  Dr. Brocker diagnosed chronic low back pain and likely carpal tunnel, left worse than right.  Tr. 470.  He recommended an EMG study of Hahn's upper extremities and refilled her medications.  Tr. 470.

An EMG performed on February 3 showed bilateral C6 and C7 motor radiculopathy.  Tr. 478.

On February 15, 2011, Hahn saw Dr. Brocker and reported back pain, stable since her last visit, and neck pain which disrupted her sleep.  Tr. 471.  She also complained of hand weakness and numbness/tingling in her hands and shoulders.  Tr. 471.  Dr. Brocker's exam findings were unchanged.  Tr. 471.  He remarked that her EMG test was consistent with cervical radiculopathy and recommended a neck MRI and x-rays.  Tr. 471.

An MRI of Hahn's cervical spine taken on February 23, 2011, showed a bulging disc at C3-C4 and cervical muscular spasm.  Tr. 475.

On March 8, Hahn again reported back and neck pain, 7/10, and shoulder blade pain, 8/10, to Dr. Brocker. Tr. 472. Medication helped and standing too long, walking too far and holding onto objects made it worse. Tr. 472. She did not use a TENS machine and was still working. Tr. 472. Dr. Brocker reviewed her cervical MRI and diagnosed her with chronic low back pain, neck pain, and cervical disc bulge and spasm. Tr. 472. He recommended a cervical epidural block. Tr. 472.

On March 14, 2011, Hahn reported to Dr. Torres that she was having neck pain (8/10) with bilateral hand numbness and decreased grip strength. Tr. 430. Dr. Torres wrote a prescription for physical therapy, gave her a TENS unit, and also administered a paravertebral injection in her cervical spine. Tr. 430, 432.

On April 11, Hahn told Dr. Torres that her neck pain had lessened to 4/10 since her injection. Tr. 428. She had been using her TENS unit. Tr. 428. Dr. Torres gave her a cervical epidural steroid injection. Tr. 429.

On June 14, 2011, Hahn told Dr. Brocker that her back pain (8/10), neck pain (6/10) and leg pain (5/10) were stable. Tr. 473. Medications and injections were helpful and standing and walking too long and pushing and pulling made it worse. Tr. 473. Dr. Brocker refilled her medications. Tr. 470-473.

Hahn saw Dr. Lewis on November 14, 2011, and reported that her TENS unit helped her pain. Tr. 488. Upon exam, she had a full range of motion in all joints. Tr. 490.

An x-ray of Hahn's cervical spine taken on December 5, 2011, showed mild degenerative changes. Tr. 449.

Hahn participated in aquatic therapy from December 2011 through February 2012. Tr. 501-505. She complained of low back pain, neck spasms and numbness in her left lower extremity. Tr. 501-505.

On January 17, 2012, Hahn saw Dr. Brocker reporting that her back and neck pain were stable since her last visit, rated 6-8/10, and that she had some hand weakness. Tr. 474. Medication helped her pain and turning her head and cold weather made it worse. Tr. 474. Dr. Brocker diagnosed her with chronic neck and low back pain and remarked that she was still being treated conservatively and was not interested in surgery. Tr. 474.

Hahn saw Dr. Lewis in February 2012 complaining of back pain, 7/10. Tr. 496. On April 9, Hahn saw Dr. Lewis again and reported low back pain (8/10), neck pain (7/10), bilateral knee pain (5/10), left leg numbness and burning and hand numbness. Tr. 492. She was unable to stand or sit for long periods of time. Tr. 492. She brought Medicaid paperwork for Dr. Lewis to fill out. Tr. 492. Upon exam, she was in moderate pain/distress, had a reduced range of motion in her lumbar and neck areas and her knees, and reduced sensation to pinprick in her left leg. Tr. 493. Dr. Lewis diagnosed her with herniated disc, injury to femoral nerve, history of low back pain syndrome, neck pain and degenerative disc disease. Tr. 494.

On July 2, 2012, Hahn saw Dr. Lewis for her annual examination. Tr. 1171. She reported that she lost her Medicaid insurance and had been seeing Dr. Torres in pain management. Tr. 1171. She could not afford her pain medications. Tr. 1171. Her pain was constant in her low back (9/10) and neck (7/10) and she had weakness and pain in her left leg and was dropping things with both hands. Tr. 1171. She had been let go at work because her employer could not honor her work restrictions. Tr. 1171. She reported only going up and down steps once a day. Tr. 1171-1172. Upon exam, she was in moderate pain/distress, had joint

tenderness and decreased range of motion, and decreased sensation over her left lower extremity. Tr. 1173. Dr. Lewis diagnosed her with degenerative disc disease, neck pain, herniated disc, and history of low back pain. Tr. 1174.

On September 7, 2012, Hahn returned to Dr. Lewis reporting severe low back pain and right hip pain. Tr. 1167. She was still using a TENS unit. Tr. 1167. She requested a right hip x-ray. Tr. 1167. She also reported stiffness, muscle aches, tingling and weakness. Tr. 1168. Upon exam, she was in moderate pain/distress, had a good range of motion in her right hip, and positive straight leg raise testing on the right. Tr. 1168. Dr. Lewis added a diagnosis of right leg pain. Tr. 1169. A lumbar x-ray taken on September 12 showed mild degenerative changes at the L5-S1 level. Tr. 1087. An x-ray of her pelvis and hips showed mild to moderate symmetric degenerative changes in her bilateral sacroiliac joints. Tr. 1094.

Hahn returned to Dr. Lewis on September 17 complaining of increased pain in her right leg/hip, 10/10, and that her right leg would give out occasionally. Tr. 1164. Upon exam, she had full range of motion in all joints and decreased sensation to light touch in her left lower extremity. Tr. 1165.

On October 19, Hahn saw another provider at Dr. Lewis's office, Charmaine Batac, M.D. Tr. 1108. She denied musculoskeletal symptoms and had a full range of motion in all joints. Tr. 1109-1110.

On February 4, 2013, Hahn saw Dr. Batac complaining of right hip pain going down to her knee for the past four weeks. Tr. 1117. Aside from this hip pain she had no other problems and denied leg weakness. Tr. 1118. She had had trouble getting her medications paid for through her insurance and had been rationing them. Tr. 1118. Upon exam, she had a normal range of motion in all joints and a lumbosacral exam showed "a positive in back only" lying

straight leg raise test on the left. Tr. 1119. Dr. Batac diagnosed low back pain syndrome and recommended home exercises. Tr. 1120. She did not prescribe medications because Hahn was under Dr. Torres's care for pain management and wanted to continue with him. Tr. 1120.

On May 6, Hahn saw Dr. Batac for her hypertension and reported that she was not in pain. Tr. 1122.

On June 18, 2013, Hahn saw Dr. Brocker complaining of chronic neck and back pain that had worsened since her last visit 1 ½ years prior, numbness and tingling in her legs, and weakness in her hands. Tr. 977. Her pain was aching and stabbing, it occurred frequently, and was 7/10 in her neck and 9/10 in her back. Tr. 977. Medications and epidurals helped the pain but sweeping the floor, standing too long or walking made the pain worse. Tr. 977. She did not exercise at home and was not using a TENS unit. Tr. 977. Upon exam, she was very obese, had tenderness in her back and an antalgic gait and was otherwise normal. Tr. 978. Dr. Brocker again discussed conservative treatment, stated that surgery should only be considered if conservative measures failed, and commented that Hahn was not a surgical candidate. Tr. 979.

On June 24, 2013, Hahn returned to Dr. Torres for pain management after not having seen him for a year due to insurance. Tr. 1082. She complained of leg, back and neck pain. Tr. 1082. On August 23, she saw Dr. Batac and had no musculoskeletal complaints and a normal, full range of motion in all joints. Tr. 1130, 1132. On August 26, 2013, Dr. Torres gave her transforaminal epidural blocks. Tr. 1081.

Records throughout 2013 and into 2014 show Hahn's visits to Dr. Torres and her continued complaints of back and right leg pain (e.g., Tr. 1027) and left leg pain (e.g., Tr. 1065). She was found upon physical exam by Dr. Torres to have a decreased cervical range of motion but no reduced lumbar range of motion (Tr. 1032, 1037, 1042, 1053, 1059, 1064, 1069, 1076)

and, once, a decreased lumbar range of motion but no reduced cervical range of motion (Tr. 1048). She complained of increased pain with activities of daily living, Tr. 1027, including 10/10 back pain when she reported that she was in the process of moving. Tr. 1044. Her pain was increased by stress, lifting and "overdoing it" with activity. Tr. 1049, 1054. She continued to get medications (e.g., Tr. 1027) and received lumbar epidural steroid injections (e.g., Tr. 1031), injections for sacroilitis (e.g., Tr. 1047), and lumbar facet blocks (Tr. 1068).

Hahn was seen for a physical therapy initial evaluation on June 19, 2014, for low back and cervical pain that she had had for about six years. Tr. 1595. She complained of paresthesias and burning down both legs frequently, left more than right. Tr. 1595. She stated that she was unable to sit, stand and walk for more than ten minutes, could not lift objects from the floor, and had increased difficulty climbing stairs. Tr. 1595. Upon exam, she had a decreased range of motion. Tr. 1596. Goals were to decrease pain, improve balance, improve function, and increase range of motion. Tr. 1596.

### C. Medical Opinion Evidence

#### 1. Treating source opinion

On January 10, 2012, Dr. Lewis completed a physical medical source statement on behalf of Hahn. Tr. 447-448. He opined that Hahn was limited to lifting/carrying ten pounds occasionally and no weight frequently, standing and walking two hours out of an eight-hour day for twenty minutes at time, and sitting for four hours out of an eight-hour day for one hour at a time, all based on "back spasm," "x-ray" and "MRI." Tr. 447. She could rarely or never climb, balance, stoop, crouch, kneel or crawl for the same reasons. Tr. 447. She could occasionally reach, handle, feel, and perform fine and gross manipulation due to back pain. Tr. 448. She would need additional breaks, a sit-stand option, and her pain was described as severe. Tr. 448.

On March 12, 2013, six months after he last saw Hahn, Dr. Lewis filled out a second, identical form. Tr. 480-481. He opined that Hahn could lift and carry five pounds occasionally and two pounds frequently, stand and walk for a total of three hours for 30 minutes at a time, and sit for a total of four hours for one hour at a time, all based on "MRI-L-spine." Tr. 480. She could occasionally stoop but rarely or never climb, balance, crouch, kneel, and crawl for the same reason. Tr. 480. She could occasionally reach, handle, feel, and perform fine and gross motor manipulation, could rarely or never push or pull, and had four environmental restrictions, but Dr. Lewis did not explain the basis for these limitations. Tr. 481. Hahn would require additional breaks and a sit-stand option and her pain was severe. Tr. 481.

### 2. Consultative examiner

On July 19, 2010, Hahn saw Dr. Mary-Helene Massulo for a consultative examination. Tr. 319-327. Hahn reported problems with her ankles since 1982 and problems with her knees since 1978. Tr. 319. She was right handed and got along with her activities of daily living "fair." Tr. 319. She weighed 249 pounds, could walk one mile, and ascend and descend stairs with a railing. Tr. 320. Upon exam, she had a normal gait and no need for an ambulatory aid; was able to grasp and manipulate with each hand; had no restriction of motion except a slightly unsteady heel, toe, and tandem gait; showed good motor tone, strength, and coordination; and had an intact sensory system and normal reflexes. Tr. 321-322. Dr. Massulo opined that Hahn would be "able to do work related types of activities such as hearing, speaking, sitting, walking, standing, lifting [and] traveling," but, due to her flat feet, may be "slightly compromised" in walking, traveling, and standing. Tr. 322.

### 3. State agency reviewers

On August 2, 2010, state agency reviewing physician Maria Congbalay, M.D., reviewed Hahn's record and completed a residual functional capacity (RFC) form. Tr. 329-335. She opined that Hahn could lift and carry 50 pounds occasionally and 25 pounds frequently, stand and walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally climb ladders, ropes, and scaffolds. Tr. 328-335.

On January 28, 2011, state agency physician Elizabeth Das, MD., reviewed Hahn's record and completed an RFC form. Tr. 420-426. She opined that Hahn could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for four hours in an eight-hour workday, sit for about six hours in an eight-hour workday, occasionally push and pull with her left lower extremity, occasionally stoop, crouch, crawl and climb ramps and stairs, but never climb ladders, ropes, and scaffolds. Tr. 420-426.

On June 12, 2014, state agency reviewing physician Gerald Klyop, M.D., reviewed Hahn's record. Tr. 673-675. Regarding her RFC, he opined that Hahn could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, push and pull an unlimited amount, never climb ladders, ropes, and scaffolds, and should avoid all exposure to hazards. Tr. 673-675.

### D. Testimonial Evidence

#### 1. Hahn's Testimony

Hahn was represented by counsel and testified at the administrative hearing. Tr. 567-598. She lives in a house with her husband, adult daughter and father. Tr. 574. She does very little driving. Tr. 575. She used to work as a licensed practical nurse. Tr. 576. More recently, since 2012, she worked part time (12-15 hours a week) at a Dollar Tree store. Tr. 579, 581. As part of her job at Dollar Tree she was expected to unload trucks and stock shelves, although she only

unloaded the truck one time. Tr. 580. The heaviest item she would have to lift to stock shelves was about 8 to 10 pounds. Tr. 580. At the time she stopped working she was mostly a cashier and she had to be on her feet the whole four hour shift. Tr. 581. She did not lift much; she would scan items, drop them in a bag, and slide the bag over to where the customer would pick it up. Tr. 582. She also stocked small items such as candy near her register. Tr. 583. She stopped working because her doctor put work restrictions for lifting and required a chair for her so she could get off her feet "for a little bit," but her employer would not honor these restrictions. Tr. 582. When asked whether she had issues at work prior to her doctor's work restrictions Hahn stated that she did, but that the store manager was a friend and made things a little easier for her. Tr. 583. However, a new manager came in and expected her to do things like a 19-year-old. Tr. 583. Hahn continued to work after the new manager started for about 1 ½ years. Tr. 583, 579. If she could use a stool at work she still would not be able to work because she can't sit straight up and down; she has to lean and leaning makes her sore "after a while." Tr. 584.

On a typical day, Hahn wakes up in the morning and takes her blood sugar level, her blood pressure, and her pills. Tr. 585. She does not do too much around the house. Tr. 585. There are certain things she can do such as folding towels or socks. Tr. 585. She can't do laundry because the machine is in the basement and she can't walk up and down the stairs. Tr. 585. If she didn't have to use stairs to get to the laundry machine she could probably do laundry. Tr. 585. She is scared about walking down the steps with her cane because the stairs are very narrow. Tr. 585. The last time she regularly went down to the basement was about five years prior and then only about once or twice a week. Tr. 585.

Hahn testified that Dr. Torres gave her a TENS unit about five years ago when she started going to see him. Tr. 587. She still uses it. Tr. 587. At the time of the hearing (March 2016)

she had been having trouble with her hands. Tr. 590. She has tremors and she drops things. Tr. 590. She has tingling and numbness that gets worse if she has to raise her hands, such as when she combs her hair or pulls a shirt over her head. Tr. 590.

Since the date of the last hearing, in 2012, she thinks that she has gotten a little worse. Tr. 591. She explained that in 2012 she didn't have breathing problems like she does now and that, because of her breathing problems, her motion has decreased. Tr. 591. She just can't get up and do the things she used to do without getting short-winded. Tr. 591. She explained that she used to go fishing ("It takes a lot of strength to cast that pole"), do canning, and crochet. Tr. 591. "Crocheting is almost a thing of the past. I haven't picked up a needle in probably over a year now." Tr. 591. She can't crochet because it requires constant use of her hands. Tr. 591. The last time she went fishing was about 1 ½ years prior to the hearing, in 2014. When pressed, Hahn stated that when she had been fishing in 2014 she didn't cast the pole as far and that a lot of times she would just sit at the end of the pier where you can "just throw it out." Tr. 592. Otherwise, she would go bank fishing at another lake and stand on the ground or sit in the chair; "I'm all over the shore there." Tr. 593. A fishing trip would last about 2 hours and her husband would take care of the gear. Tr. 593. The last time she crocheted an item to completion was 1 ½ to 2 years prior. Tr. 594-594. It took her about a year to make it and she worked on it for about 40 minutes at a time, depending on how intensive the stitch was. Tr. 594. She has a long crochet hook and that helped with her gripping. Tr. 595.

Hahn has problems sleeping because it is hard for her to get comfortable. Tr. 591. Over the last three or four years her pain in her lower back and thoracic spine has gotten worse. Tr. 592. When asked what interfered most with her ability to work, Hahn answered that it was her pain. Tr. 595. When she worked at Dollar Tree she would come home and cry, she was in so

much pain.  Tr. 595.  "When you get in pain like that, you just don't want to get up for the rest of the day and do anything."  Tr. 595.

### 2. Relevant Vocational Expert's Testimony

Vocational Expert Daniel Simone ("VE") testified at the hearing.  Tr. 596-610.  The ALJ discussed with the VE Hahn's past relevant work as an LPN.  Tr. 596.  The ALJ asked the VE to determine whether a hypothetical individual of Hahn's age (less than 50 years old), education and work experience could perform Hahn's past work or any other work if that person had the following characteristics: can lift, carry and upward pull 20 pounds occasionally and 10 pound frequently; can stand and/or walk with normal breaks two hours out of an eight-hour workday; can sit with normal breaks for six hours in an eight-hour workday; can frequently push and pull except that the individual can only occasionally push and pull with foot controls using the left, lower extremity; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; can never climb ladders, ropes or scaffolds; can perform frequent bilateral reaching in all directions and frequent fingering; must avoid occupations that require fine hearing capability and those that require frequent verbal or telephone communication; must avoid concentrated exposure to extreme cold and vibration, must avoid unprotected heights and hazardous machinery; must avoid concentrated exposure to fumes, odors, dusts, gases and pulmonary irritants; cannot perform tasks that involve high production quotas or fast-paced production demands; can have only occasional changes in workplace tasks or duties, which are gradually introduced; and is limited to jobs that could be learned in up to six months.  Tr. 596-600.  The VE answered that such an individual could not perform Hahn's past work and that the only other jobs such an individual could perform would be sedentary jobs.  Tr. 600-601.

The ALJ commented that, at the prior hearing, the prior VE identified jobs at the light level that a hypothetical individual with a similar RFC could perform. Tr. 601. The ALJ asked the VE about those specific jobs: inspector and hand packager (light work, SVP 2, about 235,000 national jobs), electronics worker (light work, SVP 2, 240,000 national jobs), and assembler of electronics (light, SVP 2, about 244,000 national jobs). Tr. 601-602. The VE stated that those jobs would be difficult for the hypothetical individual to perform because she would be limited to standing and lifting for two hours and those jobs require a good deal of standing and assembling parts that weigh 10 to 15 pounds. Tr. 603. The VE did not believe that he could reduce the number of jobs by a percentage because to do so he would be only guessing. Tr. 603.

As for sedentary jobs that the hypothetical individual could perform, the VE identified the following jobs: charge account clerk (53,000 national jobs); election clerk (75,000 fulltime national jobs); and a variety of sorting and inspecting positions (47,000 national jobs). Tr. 604. The ALJ asked the VE if his answer would change if the individual were reduced to occasional handling, fingering or reaching in any combination, i.e., either one is reduced or all three are reduced. Tr. 606. The VE answered that if the individual was limited to occasional handling or fingering she could perform the jobs identified if the limitation was for the non-dominant hand. Tr. 606. If the limitation were bilateral, the VE could not identify any jobs. Tr. 606. The VE further explained that any occasional bilateral limitation in either reaching, handling or fingering would preclude work. Tr. 606-607.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her June 20, 2016, decision, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.  Tr. 533.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset date.  Tr. 534.

3.    Since the alleged onset date of disability, November 30, 2005, the claimant has had the following severe impairments: hearing loss, obesity, degenerative disc disease of the cervical and lumbar spine, posterior tibialis tendon dysfunction, left; degenerative joint disease of the left mid-foot, restless leg syndrome, depressive disorder, NOS and anxiety disorder.  Beginning on the established onset date of disability, August 4, 2014, the claimant has had the additional following severe impairments: Type II diabetes mellitus with complication, severe sleep apnea, COPD, very severe, other intervertebral disc degeneration, thoracic regions with radiculopathy, degenerative thoracic spine, chronic kidney disease, stage 3, moderate, esophageal achalasia, status post Heller myotomy with DOR fundoplication, dysphagia, Von Willebrand disease/chronic bleeding, degenerative joint disease of the left knee with a posterior horn of the medial meniscus tear status post left knee arthroscopy with a partial medial meniscectomy, chondroplasty of the patella and the medial femoral condyle, osteoarthritis and chronic back pain.  Tr. 534.

4.    Since the alleged onset date of disability, November 30, 2005, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 534.

5.    Prior to August 4, 2014, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

and/or walk (with normal breaks) for about 2 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday; push and/or pull (including operation of hand/foot controls) limited to occasional foot controls in the left lower extremity; occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, or crawl; never climb ladders/ropes/scaffolds; could frequently reach in all directions bilaterally, frequent handling and fingering; she is limited to occupations that do not require fine hearing capability, frequent verbal communication, or frequent telephone communication. She must avoid concentrated exposure to extreme cold and vibration, avoid all unprotected heights and hazardous machinery; avoid concentrated exposure to fumes, odors, dusts, gases, pulmonary irritants; occasional changes in work place tasks or duties, which are gradually introduced; no tasks that involve high production quotas, or fast paced production demands, no visual limitations and should work in jobs which can be learned in up to 6 months. Tr. 535-536.

Beginning on August 4, 2014, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she could occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for about 2 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday; push and/or pull (including operation of hand/foot controls) limited to occasional foot controls in the left lower extremity; occasionally climb ramps and stairs, occasionally balance, stoop, kneel, crouch, or crawl; never climb ladders/ropes/scaffolds; could frequently reach in all directions bilaterally, frequent handling and fingering; she is limited to occupations that do not require fine hearing capability, frequent verbal communication, or frequent telephone communication. She must avoid concentrated exposure to extreme cold and vibration, avoid all unprotected heights and hazardous machinery; avoid concentrated exposure to fumes, odors, dusts, gases, pulmonary irritants; occasional changes in work place tasks or duties, which are gradually introduced; no tasks that involve high production quotas, or fast paced production demands, no visual limitations and she would be absent more than one day per month. Tr. 543.

6.      Since August 4, 2014, the claimant has been unable to perform any past relevant work. Tr. 545.

7.      Prior to the established disability onset date, the claimant was a younger individual age 45-49. The claimant turned 50 on November 27, 2011 and the claimant's age category changed to an individual closely approaching advanced age. Tr. 545.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 545.

9.      Prior to November 27, 2011, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. Beginning on November 27, 2011, the claimant has acquired work skills from past relevant work.  Tr. 545.

10.     Beginning on August 4, 2014, the claimant has not been able to transfer job skills to other occupations.  Tr. 545.

11.     Prior to August 4, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.  Tr. 546.

12.     The claimant has acquired work skills from past relevant work.  Tr. 547.

13.     Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferrable to other occupations with jobs existing in significant numbers in the national economy.  Tr. 547.

14.     Beginning on August 4, 2014, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 548.

15.     The claimant was not disabled prior to August 4, 2014, but became disabled on that date and has continued to be disabled through the date of this decision.  Tr. 548.

## V. Parties' Arguments

Hahn objects to the ALJ's decision on two grounds.  She argues that the ALJ erred when she evaluated Hahn's pain and that the hand and reaching limitations in the ALJ's RFC are not supported by substantial evidence.  Doc. 13, pp. 15-20.  In response, the Commissioner submits that substantial evidence supports the ALJ's evaluation of Hahn's pain and her RFC assessment limiting Hahn to frequent handling, fingering and reaching.  Doc. 16, pp. 12-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err when evaluating Hahn's pain

Hahn argues that the ALJ erred when she evaluated Hahn's pain. Doc. 13, p. 15. 20 C.F.R. § 416.929 and SSR 16-3p sets forth the standard for evaluating pain using a two-step process. SSR 16-3p, 2016 WL 119029, at *3.[2] The ALJ first considers whether the claimant had a medically-determinable impairment that could reasonably be expected to produce the individual's alleged pain and, if so, the ALJ next evaluates the intensity and persistence of the pain to determine the extent to which it limits the claimant's ability to perform work-related activities. *Id*. at *3-4. The ALJ considers "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id*. at *4. The ALJ also

---

[2] SSR 16-3p replaced SSR 96-7p and eliminates the term "credibility" to emphasize that the evaluation of pain and symptoms is not an assessment of the claimant's character. SSR-3p, 2016 WL 119029, at *1.

considers the claimant's daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medications taken; treatment, other than medication, received; and any measures used to relieve pain. *Id*. at *7.

Here, the ALJ detailed the objective evidence indicating that Hahn has limitations lifting, carrying, standing and walking. Tr. 537 (discussing Hahn's lumbar MRIs, cervical x-ray, and EMG findings). She observed that that these imaging results do not preclude Hahn from work at all exertional levels. Tr. 537. The ALJ acknowledged Hahn's pain complaints but commented that her physical exam findings were frequently unremarkable with respect to her movement, mobility and neurological defects. Tr. 537 (discussing treatment notes from Dr. Brocker), 538 (discussing notes from Dr. Massullo and Dr. Lewis), 539 (discussing notes from Dr. Brocker), 539 (discussing Dr. Lewis's notes and remarking that there was no documentation that Hahn had manipulative limitations). She remarked that Hahn had conservative treatment throughout the time period at issue. Tr. 537 (citing Dr. Brocker's notes adding Neurontin and Ultram to Hahn's medication regime and his statement that surgery should not be considered unless conservative treatments failed); 538 (discussing Dr. Jones's treatment notes detailing that Hahn reported that the injection he gave her helped and he recommended she continue conservative treatment), 539 (citing Dr. Lewis's notes showing conservative treatment with oral medication, Dr. Brocker's notes wherein he continued to recommend conservative treatment (medication, therapy, epidural injections), and Dr. Torres's note that Hahn stated that her injections helped), 541 (explaining that Dr. Brocker interpreted Hahn's cervical EMG findings as requiring conservative treatment, including tapering smoking). The ALJ noted that Hahn was not always compliant with treatment. Tr. 540 (citing office visits wherein Hahn, despite a COPD diagnosis, continued to

smoke).  The ALJ also remarked upon Hahn's activities of daily living, including treatment notes from Dr. Torres wherein she complained of pain and stress after increased activities and increased lifting (Tr. 539-549), her testimony that she continued to crochet up to the year 2015, continued to fish until the year 2014 (Tr. 541-542), continued to work part time as a cashier at Dollar Tree on her feet most of the time, and she did household chores such as fold clothes (Tr. 536).  The ALJ explained her evaluation of the opinion evidence, which Hahn does not challenge.  Tr. 538, 540, 542 (discussing Dr. Massullo's opinion and Dr. Lewis's 2010 opinion), Tr. 539, 540-542 (discussing Dr. Lewis's 2012 and 2013 opinions), Tr. 542 (discussing the three state agency reviewing physician opinions).  In short, the ALJ considered the entire case record and thoroughly discussed the objective medical evidence, medical opinions, Hahn's statements and daily activities, and her conservative treatment (medications, epidural injection), i.e., the ALJ complied with SSR 16-3p.

Hahn argues that the ALJ erred because she did not address the location and type of pain (in her back, neck and legs that was described as stabbing, aching, burning and throbbing), that the ALJ "never" reported on the type of medications she was prescribed, that epidural injections and a TENS machine are not "conservative" treatment, and that the ALJ did not analyze what aggravated or relieved her pain and "any of the other areas of pain."  Doc. 13, pp. 17-18.  All these arguments fail.  First, as Hahn concedes, the ALJ is not required to discuss every factor in SSR 16-3p.  Doc. 13, p. 16.  Nor is the ALJ required to discuss every piece of evidence.  *Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.").  Next, Hahn's assertion that the ALJ incorrectly determined that her treatment was conservative is wrong; it was Hahn's treating providers who

considered her treatment to be conservative, as the ALJ correctly noted. See, e.g., Tr. 539.

Furthermore, the ALJ cited a page from Dr. Brocker's treatment notes that listed all her

medications (Tr. 539 (citing Ex. 33F/10, Tr. 978)) and mentioned in her decision that Dr.

Brocker added Neurontin and Ultram "to her medication regimen." Tr. 537. The ALJ also

remarked that increased activity made Hahn's pain worse. Tr. 540.

In short, Hahn does not describe an error by the ALJ. Substantial evidence supports that

ALJ's decision and it must, therefore, be affirmed. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d

469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence

supports the ALJ's conclusion).

### B. Substantial evidence supports the ALJ's RFC assessment limiting Hahn to frequent handling and reaching

Hahn argues that the ALJ's RFC assessment that Hahn can frequently handle, finger and

reach bilaterally is not supported by substantial evidence. Doc. 13, p. 18. She lists certain

evidence she believes supports her argument and further asserts that she should have been

limited to occasional handling, fingering and reaching based on Dr. Lewis's opinion. Doc. 13, p.

20. But the ALJ considered the evidence Hahn cites in her brief. The ALJ commented that

Hahn testified that she had problems using her hands (Tr. 537) and acknowledged that the EMG

testing indicated findings consistent with cervical radiculopathy (Tr. 541) but also observed that

Dr. Brocker read the EMG testing as showing sensory median nerve slowing at her wrist and

minimal motor nerve slowing at the F waves and recommended conservative treatment,

including smoking less (Tr. 541). The ALJ discounted Dr. Lewis's opinions for a variety of

reasons which are not challenged by Hahn. Specifically, the ALJ observed that Dr. Lewis never

performed an examination establishing manipulative limitations. Tr. 540. Moreover, Hahn does

not identify any evidence in the record wherein any examination found her to have manipulative

limitations.  The ALJ's RFC assessment limiting Hahn to frequent handling, fingering and

reaching bilaterally is supported by substantial evidence and is affirmed.  *Jones*, 336 F.3d at 477.

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED**.


Dated: November 28, 2017

_____
Kathleen B. Burke
United States Magistrate Judge